**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTINE WOODS,** | : | **CIVIL ACTION NO. 4:17-CV-756** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CLINTON COUNTY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Christine Woods ("Woods") commenced this action against her former employer asserting claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. §§ 951-963. Defendant Clinton County (the "County") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 12).

## I.   Factual Background & Procedural History[1]

The County maintains a Department of Emergency Services (the "Department") which administers a 911 call center. (Doc. 14 ¶ 9). Kevin Fanning

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial. See id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 14, 15). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

("Fanning") has served as director of the Department since 2005. (Doc. 14-6, Fanning Dep. 11:18-12:3).[2] As director, Fanning supervises all Department employees, (Doc. 1 ¶ 7; Doc. 7 ¶ 7), and is responsible for recommending individuals for hire, promotion, and termination to the Clinton County Board of Commissioners (the "Board") for final approval.[3] (Fanning Dep. 14:11-15:19, 16:15-18).

A. **Initial Hire and Promotion (2008)**

The County employed Woods as a part-time dispatcher in the 911 call center from 2004 to September 2008. (Doc. 14 ¶ 12). Woods was promoted on September 8, 2008, to a full-time dispatcher position, subject to a 90-day probationary period. (Id. ¶¶ 12-13). In October 2008, Woods and Fanning began communicating in a personal or risqué manner via text messages, emails, phone calls, and through "chat[s]" over the Department's internal messaging system. (Doc. 14-5, Woods Dep. 13:24-14:8, 14:23-15:7; Fanning Dep. 38:1-4). Fanning purportedly commented on Woods' attire on one occasion. (Woods Dep. 13:16-17).

---

[2] Deposition transcripts have been filed by the parties at numerous, separate docket entries. We will cite to full deposition transcripts as "[Name] Dep.," without repeating the docket entry citation *passim*. We employ this citation convention for any full deposition transcripts cited throughout this memorandum. To the extent partial deposition transcripts are cited, we will retain docket entry citations for ease of location.

[3] The County cites to the deposition transcript of County Commissioner Robert Smeltz for the proposition that the Board retains ultimate authority over hiring, promotion, and termination decisions, (Doc. 14 ¶¶ 10-11), but neither party filed this transcript on the docket. Woods testified that Fanning "ha[s] the authority to hire and fire people" and that the Board must "give final approval so that people can get paid." (Woods Dep. 26:25-27:7).

In November or December of 2008, Fanning allegedly told Woods that "he wished that he had given [her] the job the old-fashioned way." (Id. at 14:9-14). When Woods replied that she already had the full-time dispatcher position, Fanning supposedly retorted that because Woods was in her 90-day probationary period, "he could do whatever he wanted to do and didn't have to keep [her] on as the full-time employee." (Id. at 14:16-22). Woods interpreted Fanning's comments as a demand that she "do what he wanted [her] to do or [she] wasn't gonna keep [her] job." (Id. at 17:7-12). Within approximately one week of this conversation, Woods performed oral sex on Fanning. (Doc. 14 ¶ 15; Woods Dep. 16:16-19, 17:13-16; Fanning Dep. 37:14-25, 39:21-24). Woods felt coerced to perform this act due to Fanning's statements. (Doc. 14 ¶ 15). Fanning and Woods' "relationship" concluded in December 2008. (See Woods Dep. 18:15-18; Fanning Dep. 37:18-22).

## B. Shift Supervisor Position (2015)

A shift supervisor position at the 911 call center became vacant in February 2015. (Doc. 14 ¶ 18). When the position was posted, candidates were asked to submit applications and resumes. (Fanning Dep. 45:24-46:3). Woods recalled submitting a "letter of intent." (Woods Dep. 25:23-26:2). Three dispatchers applied for the position: Joshua McGill ("McGill"), William Harber ("Harber"), and Woods. (Doc. 14 ¶ 19). Fanning and then-quality assurance and training supervisor Joanne Furl ("Furl") interviewed each candidate. (Fanning Dep. 46:5-14; Woods Dep. 26:5-10). The candidates were also required to complete a skills test. (Fanning Dep. 46:20-47:2; Woods Dep. 26:3-4). Fanning testified that he established the hiring process rather than the Board. (Fanning Dep. 47:9-22). He explained that the

interview process was conducted by committee.[4]  (Id. at 16:6-14).  Fanning and the

committee would then recommend a candidate to the Board for approval.  (Id.

at 16:15-18; see Woods Dep. 26:22-24).

The committee ranked the applicants for the shift supervisor position in

order of preference: (1) McGill, (2) Woods, and (3) Harber.  (Doc. 14-2 at 1).  In

support of this ranking, the interview committee reportedly viewed McGill and

Woods as "close in overall scoring of the written exam and the skills evaluation."

(Id. at 1-2).  Woods scored a 100% on her "Shift Supervisor Candidate Written

Exam," (Doc. 15-4 at 2), and McGill scored an 88% on his exam, (Doc. 15-5 at 2).

Woods and McGill possessed many of the same certifications and had completed

many of the same training courses.  (Doc. 15-7 at 3; Woods Dep. 28:2-9; 28:24-29:4).

Woods believed she had additional training and experience that McGill lacked.

(Woods Dep. 28:10-13, 28:24-29:4).  McGill worked at the 911 call center before

Woods was hired in 2004, (id. at 28:14-20), and Woods acknowledged that McGill had

"greater seniority" at the time they applied for the shift supervisor position, (id.

29:5-10; see also Doc. 14-2 at 2).  Fanning and Furl were supposedly in agreement

that Woods' "verbal skills and interpersonal skills were lacking during the interview

process."  (Doc. 14-2 at 2).

_____

[4] The structure of the interview committee changed over time.  (Fanning Dep.
17:6-19).  From approximately 2012 to early 2015, the Department director and the
quality assurance and training supervisor conducted interviews.  (Id. at 18:15-19:4).
In 2015, the interview panel expanded to include three people: the Department
director, the quality assurance supervisor, and the training and operations
supervisor.  (Id. at 19:6-22).  In 2016, the quality assurance supervisor handled only
the skills testing and the "EMA coordinator" replaced the quality assurance
supervisor on the interview panel.  (Id. at 19:23-20:4).

4

Fanning recommended McGill for the shift supervisor position on March 3, 2015. (Fanning Dep. 48:8-10; Doc. 14-2 at 2). At a March 9, 2015 meeting, the Board declined to approve McGill for the position, citing a then-recent incident involving a misrouted 911 call which garnered media attention because a house burned down. (Fanning Dep. 50:9-51:15; Doc. 14-2 at 2). McGill was apparently on duty at the time of that call, (see Fanning Dep. 51:7-8), but the record is unclear as to whether McGill was personally responsible for the error, (see id. at 50:13-51:15, 53:3-9). Woods did not work that day. (Id. at 51:21-24).

Fanning testified that, under the circumstances, the Board elected to "continue to evaluate staff and consider promotion at a later time." (Fanning Dep. 52:10-53:9). Woods testified that, after the Board decided not to promote McGill, County Commissioner Jeff Snyder ("Commissioner Snyder") suggested to Fanning that Woods be promoted instead. (Woods Dep. 45:23-46:3). According to Woods, Fanning declined to recommend her. (See id. at 46:3-4). Commissioner Snyder purportedly asked Woods "what [Fanning's] problem was with [her] as to why he wouldn't promote [her]." (Id. at 45:16-23). Fanning conceded that Woods was qualified for the position. (Fanning Dep. 47:24-48:1).

C.     **Quality Assurance Supervisor Position (2015)**

Furl retired from the quality assurance supervisor position on December 31, 2015. (Doc. 14 ¶ 28). In October 2015, the Department circulated a countywide email advertising the position. (Woods Dep. 31:18-21). Interested candidates submitted applications and cover letters of intent. (Id. at 32:4-7). Seven candidates in all applied: Woods; shift supervisor Travis Hillyer ("Hillyer"); dispatchers McGill,

Jonathan Plessinger ("Plessinger"), Joseph Sanders IV ("Sanders"), and Harber; and former dispatcher Tammy Shultz ("Shultz"). (Doc. 14 ¶ 29). Shultz was a dispatcher at the time the Department first hired Woods. (Woods Dep. 33:15-19). Shultz then worked for the Pennsylvania State Police and a municipal police force before applying for the quality assurance supervisor position. (Id. at 34:2-11). Woods testified that Shultz lacked CPR and telecommunicator certifications which Woods claims were required for the position. (See id. at 34:21-35:5, 36:9-13, 38:6-9).

Following interviews, Fanning and Furl selected three candidates to proceed to computer skills testing, to wit: Woods, Hillyer, and Shultz. (Doc. 14 ¶ 30; Doc. 15 ¶ 30). The skills testing included two components: a basic computer skills test and an interactive performance test. (See Doc. 14-2 at 2). On the basic computer skills test, Woods received a high score of 95%. (Doc. 15-6 at 2; Fanning Dep. 64:21-65:2). Hillyer scored a 93% and Shultz scored a 77%. (Doc. 15-6 at 4, 6). For the performance test, candidates were presented with a "fictitious 911 call" which they reviewed and critiqued in a memorandum. (Fanning Dep. 58:20-59:1; Doc. 14-2 at 2). According to Woods, Hillyer earned a perfect score, Woods lost half a point, and Shultz lost a full point. (Doc. 15 ¶ 33 (citing Doc. 15-6 at 3, 5, 7)). The County represents that, as to the content, Hillyer and Shultz followed instructions better and provided "a more focused view of the scenario from a quality assurance aspect as opposed to a summary of the scenario." (Doc. 14-2 at 2-3). Fanning noted that Woods was "as qualified as . . . any of the other applicants" for the quality assurance supervisor position. (Fanning Dep. at 65:3-8).

Fanning and Furl also considered each candidate's verbal and interpersonal skills and training ability. Furl noted that, at times, conflicts arose between Woods and other members of the dispatch team. (Doc. 14-2 at 3). In addition, the Department received complaints about Woods' handling of two incidents. (Id.) The first occurred in February 2014, when Woods sent a letter to a local borough council on behalf of the Department regarding "the ramifications of not having a Police Department." (Id. at 3, 16). The borough's mayor informed Fanning that certain members of the council perceived Woods' letter as threatening. (Id. at 14). The second incident occurred on August 31, 2015, when a 911 caller reported a negative customer service experience with Woods. (Id. at 21). According to a quality assurance review, Woods "made the caller feel that it was annoying to help the customer." (Id. at 23). Fanning testified that Woods was "a good dispatcher" who was never formally disciplined during the last two years she worked for the Department. (Fanning Dep. 44:22-45:6). However, Fanning and Furl agreed that Woods' "verbal skills and interpersonal skills were lacking" and that Hillyer and Shultz better met these requirements. (Doc. 14-2 at 3). Woods also did not perform well when training a new dispatcher earlier in 2015. (Id.)

At the conclusion of the interview process, Fanning ranked the remaining three candidates in the following order: (1) Hillyer, (2) Shultz, and (3) Woods. (Id.) Before Fanning made his recommendation, the Board split the responsibilities of the quality assurance supervisor position, resulting in two openings: one for the original position, and one for a newly created training and operations coordinator position. (Doc. 14-2 at 4; Fanning Dep. 65:19-66:8). On December 2, 2015, Fanning

recommended that Hillyer be transferred to the training and operations coordinator position and Shultz be hired to fill the quality assurance supervisor position. (Doc. 14 ¶ 38). The Board approved both recommendations. (Id.)

Woods confronted Fanning in an "agitated" manner after she was notified that she was not selected to fill the quality assurance supervisor position. (Doc. 14-2 at 5; Fanning Dep. 74:7-10). Fanning testified that Woods was "very heated and very vocal, very upset that she was not hired for that position" and that he recalled Woods using profanity. (Fanning Dep. 74:23-75:5). Woods allegedly "slamm[ed] down her County ID badge" and said she was quitting. (Id. at 76:11-18; see Woods Dep. 39:12-19). Following further conversation with Fanning, Woods elected not to quit. (See Fanning Dep. 77:1-11).

### D. Shift Supervisor Positions (2016)

Three shift supervisor positions became available in early 2016. (Doc. 14 ¶ 40). Rather than seeking new applications, Fanning considered the five remaining individuals who applied for the quality assurance supervisor position in October 2015. (Fanning Dep. 80:5-18). Fanning consulted with Hillyer, now the training and operations coordinator, about the skill sets of the five individuals under consideration. (Id. at 81:14-82:3). These individuals were unaware that they were candidates for the open positions, and Fanning did not conduct interviews or skills testing. (Id. at 80:20-81:9; see Woods Dep. 42:5-19). After reviewing records of previous interviews and skills testing, Fanning and Hillyer purportedly agreed that "all candidates were equal in their technical ability and skills." (Doc. 14-2 at 4). Woods maintains that she was the only candidate of the remaining five who

participated in the skills testing for the quality assurance supervisor position. (See Doc. 15 ¶ 41 (citing Doc. 15-6)).

On March 26, 2016, Fanning recommended Plessinger, Sanders, and Harber to the Board for the shift supervisor positions. (Fanning Dep. 83:12-15; Doc. 14-2 at 5). Fanning and Hillyer concluded that these three individuals possessed the interpersonal and leadership skills necessary to succeed as a shift supervisor due to their volunteer work with various public safety organizations. (Doc. 14-2 at 4-5). In determining that Woods lacked sufficient interpersonal and leadership skills, Fanning and Hillyer considered the two complaints lodged against her in February 2014 and August 2015, her confrontation with Fanning in December 2015, and more recent complaints that Woods left her console at the 911 call center on numerous occasions leaving only one dispatcher to field incoming calls. (Id. at 5). Woods testified that she had more experience, training, and certifications than the three candidates chosen to fill the shift supervisor positions. (Woods Dep. 42:23-43:8). Fanning acknowledged that Woods was technically qualified for any of these shift supervisor positions. (Fanning Dep. 82:4-6). On March 31, 2015, the Board approved Plessinger, Sanders, and Harber for promotion to shift supervisor. (Doc. 14-2 at 5; Fanning Dep. 83:23-84:3).

### E. Appeal to the Board

On April 19, 2016, Woods complained of employment discrimination to the Board. (Doc. 14 ¶ 46). Woods specifically noted that she was denied promotion three times in the past year and postulated that Fanning's failure to promote her was related to their sexual relationship and Fanning's promotion-related comments

in 2008. (Woods Dep. 49:1-17, 51:12-52:10). This was the first time Woods reported the December 2008 incident to the Board. (Doc. 14 ¶ 17; Doc. 15 ¶ 17). The Board conducted an investigation into Woods' allegations which included, *inter alia*, interviews of Fanning, Furl, Hillyer, and Woods. (Doc. 14 ¶ 47; Doc. 15 ¶ 47).

The Board presented a written statement of findings during a meeting with Woods on May 2, 2016. (Doc. 14 ¶ 49; Doc. 15 ¶ 49). Therein, the Board concluded that "no tangible employment action was taken as a result of or in retaliation for the prior relationship that existed between [Fanning and Woods]." (Doc. 15-8 at 2). The Board determined that the Department's selection processes were "proper, fair, and non-discriminatory, and that the decisions made were supported by the facts." (Id.) The Board also stated that Woods "has a history of being confrontational and insubordinate." (Id.) The statement ended with the Board committing to implement more equal employment opportunity training "to avoid any future appearance of unfair practices." (Id.) When Woods expressed her displeasure with the Board's decision, the Board offered to find Woods another position within the County. (Woods. Dep. 54:5-15). Woods resigned following this meeting. (Doc. 14 ¶ 50; Doc. 15 ¶ 50; Doc. 14-7, Meyers Dep. 75:17-76:3).

The investigation also revealed general performance deficiencies in Fanning's execution of his duties as the Department director. (Doc. 15-9 at 2). Therefore, the Board issued Fanning a performance improvement plan to remedy those deficiencies. (See id. at 2-4). Among other things, the plan directs Fanning to "[e]stablish a formal process for interviewing, promoting[,] and hiring personnel." (Id. at 3).

**F.     Procedural History**

Woods filed an administrative complaint of discrimination with the Pennsylvania Human Relations Commission ("PHRC") on April 27, 2016, and requested that it be dual filed with the United States Equal Employment Opportunity Commission ("EEOC").  (Doc. 14-1).  The EEOC issued Woods a right-to-sue letter for her administrative charge of discrimination against the County on March 22, 2017.  (Doc. 15-1 at 2).  Woods commenced the above-captioned action on April 28, 2017.  She asserts claims for sex discrimination in the form of failure to promote, hostile work environment, and constructive discharge in violation of Title VII (Count I) and the PHRA (Count II).  The County moves for summary judgment on all claims.  The motion is fully briefed and ripe for disposition.

**II.     Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

## III.  Discussion

Under Title VII, an employer may not "discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Courts analyze sex discrimination claims under Title VII and the PHRA coextensively.  See Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015) (quoting Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002)).  Accordingly, the following Title VII analysis applies equally to Woods' PHRA claims unless otherwise noted.

The County moves for summary judgment on each of Woods' sex discrimination claims.  In response to the County's motion, Woods has voluntarily withdrawn her claim for hostile work environment.  (Doc. 16 at 8 n.2).  Thus, two substantive claims remain: *first*, a claim for failure to promote based on the three promotions that the County denied Woods; and *second*, a claim for constructive discharge based on Woods' assertion that the County forced her to resign by knowingly permitting discriminatory conditions.  We will address the balance of Woods' claims *seriatim*.

### A.    Failure to Promote

The parties agree that the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), governs the court's analysis of Woods' failure-to-promote claim.  (See Doc. 13 at 6; Doc. 16 at 8).  The analysis proceeds in three steps.  First, the plaintiff must establish a *prima facie* case of discrimination under the applicable statute.  Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006).  The burden

then shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment decision. See McDonnell Douglas, 411 U.S. at 802; Scheidemantle, 470 F.3d at 539 (citation omitted). If the defendant meets its burden, the plaintiff must prove by a preponderance of the evidence that the defendant's articulated reasons for its employment decision were merely pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804-05; Scheidemantle, 470 F.3d at 539 (citations omitted).

### 1. Prima Facie *Case*

To establish a *prima facie* case of sex discrimination, Woods must demonstrate that (1) she is a member of a protected class within the meaning of Title VII; (2) she was qualified for the position she held or desired to attain; (3) she suffered an adverse employment action; and (4) the adverse action occurred "under circumstances that could give rise to an inference of intentional discrimination." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 169 (3d Cir. 2013) (quoting Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)). Woods claims that the County failed to promote her on three occasions: to a shift supervisor position in March 2015; to a quality assurance supervisor position in December 2015; and to any one of three shift supervisor positions in March 2016.

The County assumes for purposes of their Rule 56 argument that Woods has met her initial burden of proving a *prima facie* case of discrimination under Title VII and the PHRA as to the December 2015 and March 2016 failures to promote. (See Doc. 13 at 7). The County raises timeliness and merits challenges to Woods'

assertion that the County failed to promote her to a shift supervisor position in March 2015. (Doc. 13 at 8-9). We need only address the timeliness argument.

A plaintiff must file a charge of discrimination no later than 300 days "after the alleged unlawful employment practice occurred" when he or she concurrently files the charge with the EEOC and a state agency. 42 U.S.C. § 2000e–5(e)(1); Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000). In Pennsylvania, a plaintiff must file an administrative complaint of discrimination with the PHRC within 180 days "after the alleged act of discrimination." 43 PA. STAT. AND CONS. STAT. ANN. § 959(h). Woods filed her administrative complaint with the PHRC on April 27, 2016, (Doc. 14-1 at 1), and requested it be dual-filed with the EEOC, (id. ¶ 16). Therefore, any alleged act of discrimination is time-barred under Title VII if it occurred before June 4, 2015, and under the PHRA if it occurred before October 30, 2015.

Discrete acts of discrimination—*e.g.*, termination, failure to promote, denial of transfer, or refusal to hire—are not actionable if time barred. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-14 (2002). Although the time period for filing an administrative charge of discrimination "is subject to equitable doctrines such as tolling or estoppel," id. at 113 (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)), these equitable doctrines are inapplicable to "easy to identify" discrete acts of discrimination such as the failure to promote, see O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006) (quoting Morgan, 536 U.S. at 114).

The Board rejected Fanning's recommendation that McGill be promoted to shift supervisor at the March 9, 2015 meeting.  (Fanning Dep. 48:5-10, 50:5-51:15; Doc. 14-2 at 2).  Fanning represented that the Board elected to keep the position open to "continue to evaluate staff and consider promotion at a later time." (Fanning Dep. 52:17-53:9).  But according to Woods, Commissioner Snyder informed her that the Board recommended promoting Woods in place of McGill and Fanning purportedly refused.  (See Woods Dep. 45:16-46:4).  Fanning's refusal to recommend Woods for promotion was an easily identifiable, discrete act which placed Woods on notice that she should file a complaint of discrimination.  Woods' March 2015 failure to promote claim is therefore untimely under both Title VII and the PHRA.

### 2. *Legitimate, Nondiscriminatory Reason*

As to Woods' allegations of failure to promote in December 2015 and March 2016, the burden now shifts to the County to articulate one or more legitimate, nondiscriminatory reasons for their employment decisions.  See McDonnell Douglas, 411 U.S. at 802; Scheidemantle, 470 F.3d at 539 (citation omitted).  This burden is one of production, not persuasion, and requires an employer to submit evidence which, presumed true, permits the conclusion that there was a legitimate and nondiscriminatory reason for its adverse employment action.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  Woods appears not to challenge whether the County has identified sufficient legitimate, nondiscriminatory reasons for its employment decisions.  We have little difficulty concluding that the County has met its burden.

Fanning and Furl determined that Hillyer and Shultz were better candidates for the quality assurance supervisor position which became available on December 31, 2015. (Doc. 14-2 at 3; see also Doc. 14 ¶ 38). Fanning and Furl distinguished Hillyer and Shultz from Woods in several ways, (see Doc. 13 at 11-12), and were particularly concerned by the lack of verbal and interpersonal skills evinced by interoffice conflicts involving Woods and at least two customer complaints about her communications, (Doc. 14-2 at 3, 14, 21, 23). They noted that Woods performed poorly when training a new dispatcher in early 2015. (Id. at 3). Fanning and Furl also determined that, with respect to the 911 call scenario memoranda, Hillyer and Shultz followed instructions better and provided "a more focused view of the scenario from a quality assurance aspect as opposed to a summary of the scenario." (Id. at 2-3).

As to the shift supervisor positions available in early 2016, the County again indicates that Fanning and Hillyer placed significant weight on each candidate's interpersonal and leadership skills. (Doc. 13 at 14). Plessinger, Sanders, and Harber were selected to fill these positions in part because their volunteer work with various public safety organizations exemplified interpersonal and leadership skills. (Doc. 14-2 at 4-5). Fanning and Hillyer distinguished Woods, not only on the basis of past customer complaints, but also by Woods' hostile reaction and threat to quit when Fanning decided not to promote her in December 2015. (Id. at 5; see also Fanning Dep. 74:23-75:5, 76:11-18; Woods Dep. 39:12-19). The County also notes that Woods left her console at the 911 call center on numerous occasions leaving only one dispatcher to field all incoming 911 calls. (Doc. 14-2 at 5). The County has

satisfied its burden of articulating a legitimate, nondiscriminatory reason for each adverse employment action impacting Woods.

### 3. *Pretext*

At the third step of the <u>McDonnell Douglas</u> paradigm, the plaintiff may defeat summary judgment by identifying evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 427 (3d Cir. 2013) (quoting <u>Fuentes</u>, 32 F.3d at 764). A plaintiff must do more than simply claim a decision was wrong or mistaken to discredit a proffered justification. <u>Fuentes</u>, 32 F.3d at 765. The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence," <u>Burton</u>, 707 F.3d at 427 (quoting <u>Fuentes</u>, 32 F.3d at 765), "and hence infer that the employer did not act for [the asserted] non-discriminatory reasons," <u>Fuentes</u>, 32 F.3d at 765 (internal quotation marks and citations omitted).

Turning first to the quality assurance supervisor position available in December 2015, there is no dispute that Woods was substantively qualified for the position. (Fanning Dep. 65:3-8). Woods earned the highest score on the computer skills test and placed second on the performance test, (<u>see</u> Doc. 15-6 at 2-7; Fanning Dep. 64:21-65:2), although the County reasoned that Hillyer and Shultz better approached the fictitious 911 call from a quality assurance perspective as compared

to Woods' mere summary of the scenario, (Doc. 14-2 at 2-3). Woods also possessed various credentials (certifications and trainings) including two certifications which Shultz supposedly lacked. (Doc. 15-7 at 3; Woods Dep. 36:9-13).

The County chose to promote Shultz over Woods because Woods lacked necessary personal and leadership skills.[5] (Doc. 14-2 at 3). On two separate occasions during the previous year, Woods interacted with customers in an inappropriate manner. She sent a letter to a local borough council that was perceived as threatening and treated a 911 caller with disdain. (Id. at 14, 16, 21, 23). Woods clashed with coworkers from time to time and did not perform well when training a new dispatcher. (Id. at 3). Notably, Woods does not refute these facts, (see Doc. 16 at 11-12), nor does she point to any evidence purporting to contradict these work-related interpersonal difficulties, (see Doc. 14 ¶¶ 34a, 34b; Doc. 15 ¶¶ 34a, 34b).[6]

The sole evidence of discriminatory motive Woods identifies is a December 2008 sexual encounter that she felt forced to engage in to keep her probationary

---

[5] The County contends that Woods could not have been denied a promotion to the quality assurance supervisor position on account of her sex because Shultz, a woman, received the job. (Doc. 13 at 13). A female plaintiff need not establish that she was replaced by a man to prove her employer was motivated by her sex. See Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 272 (3d Cir. 2010) (citations omitted); Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 353-54 (3d Cir. 1999); see also O'Connor v. Consol. Caterers Corp., 517 U.S. 308, 312 (1996). This fact suggests an absence of improper motive but is not dispositive. Moreover, courts typically consider such arguments at the *prima facie* stage of the McDonnell Douglas framework. See Anderson, 621 F.3d at 271-72; Pivirotto, 191 F.3d at 353-55.

[6] The County's statement of material facts duplicates certain paragraph numbers, including paragraph 34. For clarity, we refer to duplicate paragraphs as "a" and "b," respectively.

promotion to full-time dispatcher. (Doc. 16 at 11; Doc. 14 ¶ 15; Woods Dep. 14:9-22, 16:16-19, 17:13-16). The record reveals no evidence of sex discrimination in the intervening seven years between this act and Fanning's decision to promote Shultz over Woods in December 2015. (See Docs. 15, 16). Woods does not so much as suggest that she encountered or perceived similar pressures in connection with subsequent employment decisions, nor does she adduce evidence from which a trier of fact could infer that Fanning's later decisions were informed by this sexual encounter. Assuming *arguendo* that this encounter was the product of coercion, it is simply too attenuated from Fanning's decision not to promote Woods in December 2015 to support a claim of sex discrimination.

Woods' March 2016 failure-to-promote claim likewise fails Rule 56 scrutiny. The County again focused on the candidates' interpersonal and leadership skills in determining who should fill the three shift supervisor positions. (Doc. 14-2 at 4-5). Woods does not dispute that Plessinger, Sanders, and Harber evinced these skills through their volunteer work. (See Doc. 16 at 10-11). In addition to previous customer and coworker grievances, the County considered intervening evidence that Woods lacked the necessary interpersonal skills, to wit: Woods' confrontation with Fanning and her threat to quit in December 2015, as well as more recent complaints that Woods abandoned her console at the 911 call center on numerous occasions, leaving only one dispatcher to field incoming calls. (Doc. 14-2 at 5). Woods fails to combat these allegations with argument or record evidence. (See Doc. 16 at 11-12; Doc. 14 ¶¶ 43a, 43b, 44; Doc. 15 ¶¶ 43a, 43b, 44).

Woods provides no evidence of sex discrimination in Fanning's March 2016 hiring decision beyond the December 2008 incident.  (See Docs. 15, 16).  She asseverates that the County's proffered justifications are undermined by Fanning's supposed abandonment of the application and interview process utilized for previous hiring decisions.  (Doc. 16 at 10).  We disagree.  It is undisputed that, in evaluating the five candidates, Fanning relied on applications and testing results from hiring processes conducted over the previous year as well as his and Hillyer's personal observations of the candidates in the workplace.  (See Doc. 14 ¶¶ 19, 30; Doc. 15 ¶ 30; Doc. 14-2 at 4; Fanning Dep. 46:20-47:2, 80:5-82:3; Woods Dep. 25:23-26:4).  Moreover, Fanning's chosen method of evaluating candidates in no way undermines the County's uncontested assertion that Woods lacked interpersonal and leadership skills pertinent to the shift supervisor position.

Woods' argument that she was substantively qualified for these various positions amounts to no more than a disagreement with the County's business judgment as to who to promote.  Personal disagreement with an employer's business judgment is insufficient to establish pretext.  See Fuentes, 32 F.3d at 765. Based on this record, we find that no reasonable jury could conclude that the County discriminated based on sex in its hiring decisions made in December 2015 or March 2016.  Therefore, we will grant summary judgment in the County's favor on Woods' failure to promote claim.

B.     Constructive Discharge

Whether an employee has suffered discrimination-induced constructive discharge is an objective determination.  Colwell v. Rite Aid Corp., 602 F.3d 495, 502

(3d Cir. 2010).  The employee must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them" would have felt compelled to resign.  Mandel, 706 F.3d at 169 (citation omitted).  The circumstances or conduct of which the employee complains must "surpass[] a threshold of intolerable conditions." Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 331 (3d Cir. 2016) (citation omitted).  In assessing the alleged conditions, courts consider several non-exhaustive factors, including whether the employer (1) threatened to fire the employee or urged or suggested resignation or retirement, (2) demoted the employee, (3) decreased the employee's pay or benefits, (4) involuntarily transferred the employee to a "less desirable" position, (5) changed the employee's job responsibilities, or (6) issued the employee unsatisfactory performance evaluations.  Colwell, 602 F.3d at 503 (quoting Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).  Actions an employee takes or fails to take in response to complained-of circumstances are also relevant in determining whether conditions were so unbearable as to compel resignation.  See DiFiore v. CSL Behring, LLC, 879 F.3d 71, 79 (3d Cir. 2018).

The record does not support a claim of constructive discharge.  We do not doubt that Fanning's failure to promote Woods on three occasions over the course of a year was frustrating and disappointing, but such conduct does not constitute intolerable employment conditions.  None of the Colwell factors are present in this case, and Woods does not assert any material change to her current employment in conjunction with Fanning's decisions not to promote her in 2015 or 2016.  (See Doc. 16).  Moreover, as discussed *supra*, Woods points to no contemporaneous

evidence that Fanning's decisions not to promote her were motivated by sex discrimination.

The only evidence of sex discrimination that Woods adduced is the purportedly coerced sexual encounter in 2008. (Woods Dep. 14:9-22, 16:16-19, 17:7-16; Fanning Dep. 37:14-25, 39:21-24; Doc. 14 ¶ 15). Woods reported this incident to the Board for the first time on April 19, 2016. (Doc. 14 ¶ 17; Doc. 15 ¶ 17). Although the Board determined that the Department's selection processes were fair and free of discrimination, it nonetheless responded to Woods' concerns by committing to implement more equal employment opportunity training, (Doc. 15-8 at 2), and insisting that a "formal process for interviewing, promoting[,] and hiring personnel" be established. (Doc. 15-9 at 3). The Board also offered to find Woods another position within the County. (Woods. Dep. 54:5-15). Nevertheless, Woods immediately resigned following the Board's announcement of its findings. (Doc. 14 ¶ 50; Doc. 15 ¶ 50; Meyers Dep. 75:17-76:3). The record does not support Woods' intimation that the alleged 2008 discrimination compelled her 2016 resignation, and there is no other evidence from which a jury could find that conditions in the Department were so "intolerable" as to force Woods to resign. Accordingly, the County is entitled to summary judgment on Woods' constructive discharge claim.

**IV.** **Conclusion**

The court will grant the County's motion for summary judgment. An appropriate order shall issue.

<div align="center" style="float:right">

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

</div>

Dated:     March 27, 2019